**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JUPITER MEDICAL CENTER                                  )
1210 S OLD DIXIE HIGHWAY.                                )
 JUPITER, FL 33458                                      )
                                                        )
HALIFAX MEDICAL CENTER                                  )
303 N. CLYDE MORRIS BLVD.                               )
DAYTONA BEACH, FL 32114                                 )
                                                        )
LEESBURG REGIONAL MEDICAL CENTER                        )
600 E DIXIE AVE                                         )
Leesburg, FL 34748                                      )
                                                        )
THE VILLAGES REGIONAL HOSPITAL                          )
1451 EL CAMINO REAL                                     )
THE VILLIAGES, FL 32159                                 )
                                                        )
HEALH FIRST'S HOLMES REGIONAL                           )
MEDICAL CENTER                                          )
1350 SOUTH HICKORY STREET                               )
MELBOURNE, FL 32901                                     )
                                                        )
HEALTH FIRST'S                                          )
CAPE CANAVERAL HOSPITAL                                 )
701 WEST COCOA BEACH CAUSEWAY                           )
COCOA BEACH, FL 32931                                   )
                                                        )
HEALTH FIRST'S PALM BAY HOSPITAL                        )
1425 MALABAR ROAD NORTHEAST                             )
PALM BAY, FL 32907                                      )
                                                        )
HEALTH FIRST'S VIERRA HOSPTAL                           )
8745 N. WICKHAM ROAD                                    )
PALM BAY, FL 32907                                      )
                                                        )
SOUTHEAST GEORGIA HEALTH SYSTEM                         )
BRUNSWICK CAMPUS                                        )
2415 Parkwood Drive                                     )
Brunswick, GA 31520                                     )
                                                        )
                                                        )

SOUTHEAST GEORGIA HEALTH SYSTEM )
CAMDEN CAMPUS )
2000 DAN PROCTOR DRIVE )
ST. MARYS, GA 31558 )
)
AUGUSTA UNIVERSITY MEDICAL CENTER )
1120 15th STREET )
AUGUSTA, GA 30912 )
)
LARKIN COMMUNITY HOSPITAL )
7031 SW 62ND AVENUE )
SOUTH MIAMI, FL 33143 )
)
LARKIN COMMUNITY HOSPITAL )
PALM SPRINGS CAMPUS )
1475 W. 49TH STREET )
HIALEAH, FL 33012 )
)
FLOYD MEDICAL CENTER )
304 TURNER MCCALL BLVD )
ROME, GA 30165 )
)
RUBY HOSPITAL )
1 MEDICAL CENTER DR. )
MORGANTOWN, WV 26506 )
)
UNITED HOSPITAL CENTER )
327 MEDICAL PARK DR. )
BRIDGEPORT, WV 26330 )
)
BERKELEY MEDICAL CENTER )
2500 HOSPITAL DR )
MARTINSBURG, WV 25401 )
)
REYNOLDS MEMORIAL HOSPITAL )
800 WHEELING AVE )
GLEN DALE, WV 26038 )
)
CAMDEN-CLARK MEMORIAL HOSPITAL )
800 GARFIELD AVE )
PARKERSBURG, WV 26101 )
)
NHC BAKER HOSPITAL DOWNTOWN )
350 SEVENTH STREET )
NORTH NAPLES, FL 34102 )
)

2

MARY LANNING MEMORIAL HOSPITAL )
715 NORTH SAINT JOSEPH AVE )
HASTING, NE 68901 )
)
ANAHEIM REGIONAL )
MEDICAL CENTER )
1111 WEST LA PALMA AVENUE )
ANAHEIM, CA  92801 )
HOUSTON, TX  77030 )
)
GARFIELD MEDICAL CENTER )
525 NORTH GARFIELD AVENUE )
MONTEREY PARK, CA  91754 )
BAYTOWN, TX  77521 )
SPOKANE VALLEY, WA  99216 )
)
GREATER EL MONTE COMMUNITY )
HOSPITAL )
1701 SANTA ANITA AVENUE )
SOUTH EL MONTE, CA  91733 )
SUGAR LAND, TX  77479 )
)
MONTEREY PARK HOSPITAL )
900 SOUTH ATLANTIC BOULEVARD )
MONTEREY PARK, CA  91754 )
HOUSTON, TX  77070 )
)
SAN GABRIEL VALLEY MEDICAL CENTER )
438 WEST LAS TUNAS DRIVE )
SAN GABRIEL, CA  91776 )
)
WHITTIER HOSPITAL MEDICAL CENTER )
9080 COLIMA ROAD )
WHITTIER, CA  90605 )
)
ALHAMBRA HOSPITAL MEDICAL CENTER )
100 SOUTH RAYMOND AVENUE )
ALHAMBRA, CA  91801 )
)
PARKVIEW COMMUNITY HOSPITAL )
MEDICAL CENTER )
3865 JACKSON STREET )
RIVERSIDE, CA  92503-3919 )
)
)
)

3

|  | ) |  |
|---|---|---|
| *Plaintiffs*, | ) |  |
|  | ) |  |
| v. | ) | Civil Action No. |
|  | ) |  |
| ALEX M. AZAR II, | ) |  |
| in his official capacity as SECRETARY OF | ) |  |
| HEALTH AND HUMAN SERVICES, | ) |  |
| 200 Independence Avenue, S.W. | ) |  |
| Washington, D.C. 20201, | ) |  |
|  | ) |  |
| *Defendant*. | ) |  |
|  | ) |  |

## COMPLAINT

Plaintiffs Jupiter Medical Center et al. bring this Complaint against Defendant Alex M. Azar II, in his official capacity as Secretary of Health and Human Services (HHS), and allege as follows:

## INTRODUCTION

1.     The Plaintiffs challenge provisions of the final regulation issued by the Centers for Medicare & Medicaid Services ("CMS"), the agency within the Department of Health and Human Services ("HHS") that administers the Medicare program, published in the Federal Register on November 21, 2018..  *See* Centers for Medicare & Medicaid Services, *Medicare Program: Changes to Hospital Outpatient Prospective Payment and Ambulatory Surgical Center Payment Systems and Quality Reporting Programs*, Dep't of Health and Human Servs., 83 Fed. Reg. 58,818 (Nov. 21, 2018) (the "Challenged Rule).  The Challenged Rule, in relevant part, substantially and inequitably reduced Medicare payment rates for specified services furnished at certain off-campus hospital provider-based departments ("off-campus PBDs"), commencing on January 1, 2019.  For Medicare payment purposes, an off-campus PBD is a remote hospital location integrated with and controlled by the hospital as to be considered a part of the hospital.

4

2.      The Medicare statute distinguishes between "excepted" off-campus PBDs, which satisfy specified "grandfathering" requirements, and "non-excepted" off-campus PBDs, which do not.  The statute makes clear that services provided at excepted and non-excepted off-campus PBDs should be paid pursuant to different payment systems.  42 U.S.C. § 1395l(t)(21)(C).   In blatant violation of the statute, the Challenged Rule ignores the distinction between excepted and non-excepted entities and, as a result treats them as identical by payment purposes.    The Challenged Rule violates the clear intent of Congress and, accordingly, represents prototypical *ultra vires* agency action. .

3.      The Medicare Act governs the process by which CMS implements annual payment changes covered hospital outpatient services under Medicare. 42 U.S.C. § 1395l(t)(9)(A).  The Medicare Act mandates that payment changes for specific items or services be budget neutral.  42 U.S.C. § 1395l(t)(9)(B).  In stark contravention of this statutory mandate, CMS has promulgated the Challenged Rule which reduces total payments for covered hospital outpatient services for calendar year ("CY") 2019 by hundreds of millions of dollars by targeting a select group of services for non-budget-neutral payment adjustments.  CMS cannot exercise its limited authority in a manner so flagrantly inconsistent with the Medicare statute.  This action is also *ultra vires*.

4.      This Court should reject CMS's attempts to replace Congress's unequivocal directives with the agency's own policy preferences.   CMS may not contravene clear congressional mandates merely because the agency wishes to make cuts to Medicare spending.

## PARTIES

5.      The Plaintiffs are all certified as hospitals in the Medicare program to provide inpatient and outpatient hospital services to persons enrolled in Medicare program.

30824651.1

6.     All of the Plaintiffs suffer immediate and concrete harm from the outpatient service payment reductions set forth in the Challenged Rule.

7.     Defendant Alex M. Azar II, is the Secretary of HHS and is responsible for the conduct and policies of HHS, including those relating to the Hospital Outpatient Prospective Payment and Ambulatory Surgical Center Payment Systems and Quality Reporting Programs. The Secretary maintains an office at 200 Independence Avenue, S.W., Washington, D.C. 20201, and is sued in his official capacity only.

## JURISDICTION AND VENUE

8.     Jurisdiction in this Court is grounded upon and proper under 28 U.S.C. § 1331, in that this civil action arises under the laws of the United States; 28 U.S.C. § 1346, in that this case involves claims against the federal government; 28 U.S.C. § 1361, in that this is an action to compel officers of the United States to perform their duty; and 28 U.S.C. §§ 2201–2202, in that there exists an actual justiciable controversy as to which Plaintiffs require a declaration of their rights by this Court and injunctive relief to prohibit the Defendants from violating laws and regulations.

9.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (e) because this is a civil action in which the Defendant is an officer of the United States acting in his official capacity and maintains his office and conducts business in this judicial district.  Moreover, a substantial part of the events giving rise to the claims occurred within this judicial district.

10.     Plaintiffs have standing to bring this lawsuit because the Plaintiffs are suffering and face imminent actual injury as a result of CMS's *ultra vires* decision to reduce the payment rates for targeted services furnished at members' off-campus PBDs.

11.     This lawsuit is ripe for judicial review.  Because Plaintiffs are alleging *only* that CMS is acting well beyond the agency's statutorily granted powers, this Court has the authority

to review Plaintiffs' claims, and to do so now.  *See Amgen, Inc. v. Smith*, 357 F.3d 103, 114 (D.C. Cir. 2004); *American Hospital Ass'n v. Azar*, D.E. 25, No. 18-2084-RC (D.D.C. Dec. 27, 2018).

12.     After the Challenged Rule became effective on January 1, 2019, the Plaintiffs presented claims to their Medicare Administrative Contractors ("MACs").  The Plaintiffs are being paid at the lower rates governed by the Challenged Rule, rather than the rates required by the Medicare Act.  Statutory requirements relating to exhaustion are not applicable in the context of a non-statutory *ultra vires* challenge.  In any event, further administrative appeal or review of the Plaintiffs' claims would be futile, both because CMS administrative adjudicators are bound by the Challenged Rule, and because CMS has refused to change its position in response to these very same legal arguments.

## STATUTORY AND REGULATORY BACKGROUND

**Statutory Framework**

13.     The Medicare program is enshrined in Title XVIII of the Social Security Act by establishing a program of health insurance for the aged and disabled  42 U.S.C. §§ 1395 *et seq*. The Plaintiffs have entered into contracts with CMS as Medicare-certified providers of hospital services.

14.     Part B of the Medicare Act covers, among other things, hospital outpatient department services ("OPD services"), *i.e.,* services that are provided to patients on an outpatient basis.   OPD services include emergency or observation services, services furnished in an outpatient clinic (*e.g*., physician visits, same-day surgery), laboratory tests billed by the hospital, medical supplies (*e.g*., splints and casts), preventive and screening services, and certain drugs and biologicals.

15.     Payments for OPD services are generally made under the Medicare Outpatient Prospective Payment System ("OPPS") established by 42 U.S.C. § 1395l(t).   The Medicare statute authorized CMS to establish the OPPS pursuant to requirements specified in 42 U.S.C. § 1395l(t)(2)(A) through (H).

16.     The Medicare statute authorizes CMS, on an annual basis, to review and revise the "groups, the relative payment weights, and the wage and other adjustments. . . to take into account changes in medical practice, changes in technology, the addition of new services, new cost data, and other relevant information and factors." 42 U.S.C. § 1395l(t)(9)(A).

17.     The Medicare Act, however, establishes clear limits on annual adjustments, including the essential requirement that any such adjustments be budget neutral.   Specifically, Congress mandated: "the adjustments for a year may not cause the estimated amount of expenditures under this part for the year to increase or decrease from the estimated amount of expenditures under this part that would have been made if the adjustments had not been made." 42 U.S.C. § 1395l(t)(9)(A).   Accordingly, any adjustments under Subsection (t)(9)(A) must be budget neutral, and CMS may not reduce Medicare Part B spending by selectively slashing the payment rates for specific types of services.

18.     When Congress confers authority on CMS to make non-budget neutral changes, it has said so expressly.  *See, e.g.,* 42 U.S.C. § 1395l(t)(7)(I).  Indeed, if CMS wishes to make *non-*budget-neutral cuts to payments under the OPPS, the statute provides a separate mechanism for the agency to do so.   First, the statute authorizes CMS to "develop a method for controlling unnecessary increases in the volume of covered OPD services." 42 U.S.C. § 1395l(t)(2)(F). Once the agency identifies that method, another statutory provision authorizes the agency to make non-budget-neutral adjustments to address those unnecessary increases in volume - but

8

only through across-the-board adjustments to all items or services paid under the OPPS. Specifically, Subsection (t)(9)(C) provides that if CMS determines under Subsection (t)(2)(F) that the "volume of services . . . [has] increased beyond amounts established through those methodologies," CMS "may appropriately adjust the update to the conversion factor otherwise applicable in a subsequent year." *Id*. § 1395l(t)(9)(C).   The conversion factor is a uniform amount that is used in the formula to calculate payment rates for *all* services or items paid under the OPPS.  In other words, a conversion factor adjustment can shrink (or grow) the entire OPPS by a percentage-factor, but it cannot reduce the relative rate of payment for a particular set of services or items.

19.     CMS must make across board adjustments for  to all services and items under the OPPS, by using the conversion factor.  For specific services, CMS must act in a budget-neutral manner.

### *Off-Campus Provider-Based Departments*

20.     At issue in this lawsuit are Medicare payments for certain clinic visit services provided at off-campus PBDs.  As previously noted, off-campus PBDs are practice locations of a hospital that are not in immediate proximity to the main hospital building, but are nonetheless so closely integrated with the hospital as to be considered a part of the hospital.  *See* 42 C.F.R. § 413.65(e).  An off-campus PBD could include a stand-alone oncology clinic, an urgent care clinic, or an office providing necessary specialty services (*e.g.*, cardiology, pulmonology, neurology, and urology).  Off-campus PBDs vary significantly in function and purpose.  In some cases, a hospital may lack the space on its main campus to expand, and a practice location is located off-campus as a matter of necessity.  In other cases, there may be operational reasons for

having a practice location off-campus.  For example, a hospital might want to place an off-campus PBD in a location that is convenient to the patient population it serves.

21.     Off-campus PBDs must be closely integrated with their main hospitals and are subject to regulatory requirements as a part of the hospital—unlike independent clinics or physician offices.  *See* 42 C.F.R. § 413.65(a).  As a result, off-campus PBDs often have higher costs relative to a physician office.  There are many reasons for this: The patient population that visits off-campus PBDs tends to be sicker and poorer than the patient population that visits independent physician offices.  *See* Comparison of Care in Hospital Outpatient Departments and Independent Physician Offices (KNG Health Consulting LLC, 2018).  In addition, off-campus PBDs are often intended to serve more functions than standalone physician offices. For example, an off-campus PBD may be an emergency department operating on nights and weekends with a team of specialist doctors and nurses on staff.  In addition, CMS requires off-campus PBDs to satisfy the Medicare Conditions of Participation applicable to their main hospital, which are more demanding than the requirements imposed on physician offices or clinics.  *See* Hospital Outpatient Department (HOPD) Costs Higher than Physician Offices Due to Additional Capabilities, Regulations https://www.aha.org/system/files/2018-09/info-hopd.pdf.

### Section 603 of the Bipartisan Budget Act of 2015

22.     Until November 2015, clinic visit services at *all* off-campus PBDs were paid under the OPPS, at the relatively higher payment rates paid to hospitals (as compared to their physician office counterparts).  83 Fed. Reg. 59,004–005.

23.     The total volume of outpatient services furnished at off-campus PBDs nationwide has been increasing for years.  *Id.* at 59,005-007.  That increase has been necessary and appropriate.  The Medicare-eligible population as a whole has increased during that same period.

In addition, as medical technology has evolved, more and more services are able to be furnished on an outpatient (rather than an inpatient) basis.

24.     Among the many factors contributing to the increase in volume of outpatient services furnished at off-campus PBDs is the acquisition of stand-alone physician offices by some hospitals and integration of the physician offices into hospital operations.  CMS took the view that Medicare costs could be lowered if these same outpatient services were furnished in a less-expensive physician office setting.  83 Fed. Reg. 59,008–009.  The off-campus PBDs could—the agency argued—be effectively de-integrated from their main hospital and operated independently, and therefore paid under the Medicare physician fee schedule rather than the OPPS.  In response, commenters pointed out that off-campus PBDs have higher costs than physician offices (in some cases, exceeding even the current payment rate for such services) and that off-campus PBDs are often able to provide services that are not available in physician offices.  Commenters also noted that paying off-campus PBDs at the lower rates paid to physicians would upset the reasonable expectations of hospitals that acquired or built off-campus PBDs with the understanding that they would be paid under the OPPS.

25.     Congress sought to balance these competing concerns when it enacted Section 603 of the Bipartisan Budget Act of 2015. Pub. L. No 114-74 § 603, 129 Stat. 584, 598. Congress's solution was to create two classes of off-campus PBDs.  Qualifying off-campus PBDs that were billing as a hospital department under the OPPS when the statute took effect on November 2, 2015 (so-called "excepted PBDs") would continue to be paid under the OPPS.  *See* 42 U.S.C. §§ 1395l(t)(1)(B)(V), (t)(21) & (t)(21)(B)(ii).  But going forward, Congress required that *newly* created or acquired off-campus PBDs (so-called "non-excepted PBDs") be paid under the "applicable payment system" in order to eliminate the possibility that a payment differential

could be a factor in a hospital's decision to open a new off-campus PBD.  *Id.* § 1395l(t)(21)(C));

*see also id.* § 1395l(t)(21)(B)(iii)–(vi) (codifying additional exceptions, such as for off-campus

PBDs that were mid-build when Section 603 was enacted, which allowed those mid-build PBDs

to continue to be paid under the OPPS).

26.     CMS has interpreted the statutory phrase "applicable payment system" to mean

that non-excepted PBDs should be paid under the Medicare Physician Fee Schedule (PFS).

81 Fed. Reg. 79,562, 179,659 (Nov. 14, 2016).  The Physician Fee Schedule has lower payment

rates relative to OPPS because it is intended to reflect the costs for furnishing items or services in

a physician office (as opposed to in a hospital).  Thus, the payment rates for excepted PBDs

(under the OPPS) are generally higher than non-excepted PBDs (under the Physician Fee

Schedule).

27.     In practice, CMS does not actually abide by the statutory requirement to pay

non-excepted PBDs under a separate payment system from OPPS.  Rather, CMS continues to

pay such non-excepted PBDs under the OPPS but applies a "PFS Relativity Adjustor," which

CMS says is intended to approximate what the rate of payment "would have been" if the item or

service were actually paid under the Physician Fee Schedule.  *See generally* 81 Fed. Reg. 79,562,

79,726 (Nov. 14, 2016).

28.     Common sense and the statutory structure make clear that in requiring that

excepted and non-excepted PBDs be subject to different payment systems, Congress intended

that they would receive different rates of payment.  Congress's choice to grandfather some

off-campus PBDs to permit them to continue billing under the OPPS, and thus be subject to

different payment rates from other off-campus PBDs, cannot have been anything but deliberate.

**The Challenged Rule**

29.     On July 31, 2018, CMS published a Proposed Rule proposing changes to the OPPS for CY 2019.  As relevant here, the Proposed Rule proposed changes to the payment rate for certain clinic visit services provided at *excepted* PBDs in order to render it equal to the payment rate for services provided at *non*-excepted PBDs (the Clinic Visit Policy).  Specifically, the Proposed Rule stated that the payment rate for clinic services provided by excepted PBDs in CY 2019 "would now be equivalent to the payment rate for" services provided by non-excepted PBDs.  83 Fed. Reg. 37,046, 37,142 (July 31, 2018).  CMS proposed to make this adjustment in a non-budget-neutral fashion.  *Id.*  In other words, the payment rate reductions proposed by CMS would *not* be offset by increases in other payment rates under the OPPS to ensure that the overall payments to hospitals would remain the same.  CMS estimated that this change would result in reductions in payments to hospitals of $760 million in CY 2019 alone.  *Id.* at 37,143.

30.     Almost 3,000 commenters submitted comments in response to the Proposed Rule, including the American Hospital Association, the Association of American Medical Colleges, and the Plaintiffs or their associated health systems through an association.  Among other things, Plaintiffs pointed out that CMS was statutorily prohibited from making adjustments to payment rates in a non-budget-neutral manner under 42 U.S.C. § 1395l(t)(9)(B).  Plaintiffs also explained that the Proposed Rule ran afoul of Congress's statutory mandate that CMS treat excepted and non-excepted PBDs differently under 42 U.S.C. § 1395l(t)(21).

31.     On November 2, CMS posted the Challenged Rule on its website.  Like the Proposed Rule, the Challenged Rule adjusts the payment rate for services provided by excepted PBDs so that it is "equal to" the payment rate for services provided by non-excepted PBDs.  83 Fed. Reg. 58,822, 59,013.  CMS explained its decision succinctly:  "To the extent that similar

services can be safely provided in more than one setting, we do not believe it is prudent for the Medicare program to pay more for these services in one setting than another." *Id.* at 59,008. CMS also confirmed its decision to implement the adjustment in a non-budget-neutral fashion. *Id.* at 59,014.  However, CMS announced that it would be phasing in the payment reduction over a two-year period, such that the estimated reductions in payments to hospitals in CY 2019 would be approximately $380 million.  *Id.*

33.    The Challenged Rule became effective on January 1, 2019.

## The Challenged Rule Exceeds CMS's Authority Under the Medicare Act

33.    In promulgating the Challenged Rule, CMS has acted in clear violation of its statutory authority.  This is so for at least two separate reasons: (i) the Clinic Visit Policy violates the Medicare statute's mandate of budget neutrality; and (ii) the Clinic Visit Policy violates the statutory mandate that excepted and non-excepted PBDs must be treated differently.

### *Budget Neutrality:*

34.    The Challenged Rule is *ultra vires* because the Clinic Visit Policy is not budget neutral, in plain violation of the statute.  By CMS's own admission, the Clinic Visit Policy set forth in the Challenged Rule would reduce total hospital payments by $380 million in CY 2019, and $760 million in CY 2020, with no offsetting increases in payments for other services.  83 Fed. Reg. 59,014.  Indeed, that was one of the *justifications* given by CMS for its proposed adjustments.  *Id.*

35.    But a critical element of the statute's structure is that changes in the payments for individual OPD services be made "in a budget neutral manner." 42 U.S.C. § 1395l(t)(9)(B).  That is, if CMS wishes to reduce the amount of Medicare payments going to one type of service, it must increase the payments for other items or services in equal amount.  *Id.*

36.     While the Medicare statute allows for reductions to the total amount of Medicare payments in appropriate, limited circumstances under Subsection (t)(9)(C) through changes to the conversion factor, there is *no* statutory mechanism allowing CMS to reduce the total amount of Medicare payments by targeting only selected services.  By requiring budget neutrality for payment reductions targeting specific services, the statute recognizes - and puts a check on - any incentive for CMS to employ draconian cost-control measures.

37.     To circumvent the statutory requirement that annual adjustments be budget neutral, CMS has claimed that its authority to adopt the Clinic Visit Policy flows not from the annual adjustment authority granted in Subsection (t)(9)(A), but from the agency's separate statutory authorization to "develop a method for controlling unnecessary increases in the volume of covered OPD services." *Id.*  § 1395l(t)(2)(F).  CMS grounds the Clinic Visit Policy in Subsection (t)(2)(F) for a strategic purpose: that provision, unlike the rest of Subsection (t), makes no express mention of budget neutrality.

38.     Subsection (t)(2)(F) is not required to address budget neutrality because it does not actually authorize the agency to make any adjustments or changes to payment rates at all. Instead, it merely authorizes CMS to "*develop a method* for controlling unnecessary increases" in the volume of services.  42 U.S.C. § 1395l(t)(2)(F).  Another statutory provision governs how that method may be *used* in actual volume-control efforts.

39.     Subsection (t)(9)(C) addresses what CMS must do to make adjustments based on a finding under Subsection (t)(2)(F) that there are unnecessary increases in the volume of services: "If the Secretary determines under the methodologies described in paragraph (2)(F) that the volume of services paid for under this subsection increased beyond amounts established through those methodologies, the Secretary may appropriately *adjust the update to the*

*conversion factor* otherwise applicable in a subsequent year." *Id.* § 1395l(t)(9)(C) (emphasis added). The conversion factor applies broadly to affect the payments for all covered services and cannot be used to change the relative payment rates between and among individual services.

40.     Contrary to CMS's assertion, then, Subsection (t)(2)(F) does not confer authority to modify payment rates for specific items or services in response to unnecessary increases in the volume of OPD services. Rather, as noted above, if the methodology developed by CMS under Subsection (t)(2)(F) shows that there are unnecessary increases in the volume of OPD services, Congress has said in Subsection (t)(9)(C) that CMS's recourse is to modify the conversion factor and effectuate an across-the-board reduction in payment rates under the OPPS. And to state the obvious, in the clinic visit policy portion of the Challenged Rule CMS has not adjusted the update to the conversion factor. Instead, it has only decreased the payments for a certain subset of services. In short, Subsection (t)(2)(F) is of little use to CMS in justifying the Challenged Rule.

41.     In explaining its statutory authority in the Challenged Rule, CMS attempted to bolster its reliance on Subsection (t)(2)(F) by arguing that it had, in prior proposed rules, purported to invoke Subsection (t)(2)(F) to justify selective cuts to payment rates. 83 Fed. Reg. at 59,004 - 005. Not so. In fact, CMS has never actually implemented *anything* using Subsection (t)(2)(F).

42.     In 1998, CMS proposed invoking Subsection (t)(2)(F) when establishing the OPPS, but that proposal – which involved modifications to *the conversion factor*—was indefinitely delayed for "further study" in another CMS action in 2000. 65 Fed. Reg. 18,434, 18,502–503 (April 7, 2000). Indeed, CMS said that "possible legislative modification" would be necessary before it could use its authority under Subsection (t)(2)(F) to adopt alternative options,

which would have implemented non-conversion factor adjustments. And in 2001, both CMS and the Medicare Payment Advisory Commission (MedPAC) implicitly acknowledged that the options turned on selecting the proper contemplated methodology for triggering updates *to the conversion factor*. 66 Fed. Reg. 59,856, 59,908 (Nov. 30, 2001). Thus, in every prior instance that the agency considered invoking Subsection (t)(2)(F), CMS implicitly (and correctly) acknowledged that any corresponding non-budget neutral changes to payment rates must occur pursuant to a change in the conversion factor. CMS's present assertion of sweeping authority to target only specific types of services under Subsection (t)(2)(F) in the Challenged Rule is unprecedented—and unlawful.

43.     In any event, CMS has never made an adequate factual finding—as it must to lawfully invoke whatever authority it has under Subsection (t)(2)(F)—that any increase in the volume of covered OPD services is "unnecessary." Instead, the agency merely asserted in circular fashion that the increases in volume of covered outpatient services *must* have been "unnecessary" simply because they occurred. 83 Fed. Reg. 59,006–008. To bolster this self-serving conclusion, CMS purports to rely upon recommendations and estimates made by MedPAC, an agency established *by Congress* to make recommendations *to Congress* regarding payment policy. *See* 42 U.S.C. § 1395b-6. And Congress has already spoken about the appropriate path forward here.

44.     For the foregoing reasons, the Clinic Visit Policy is *ultra vires* because it is not budget neutral, as required by the plain language of the statute.

***Statutory Distinction Between Excepted and Non-Excepted PBDs.***

45.     In addition, the Challenged Rule is *ultra vires* because it sets the same rate of payment for clinic visit services provided at both excepted and non-excepted PBDs, in violation

of Congress's statutory command.  Specifically, the Challenged Rule provides that the payment rate for services provided at excepted PBDs will be adjusted so that it would be "equal to" the payment rate for services provided at non-excepted PBDs.  83 Fed. Reg. 59,013.

46.     The Medicare Act reflects Congress's intent to treat excepted and non-excepted PBDs differently.  The statute creates two distinct categories of off-campus PBDs: excepted entities, which satisfy certain grandfathering requirements and may continue billing under the OPPS, and non-excepted entities, which do not and must instead be paid under an alternative payment system.  *See* 42 U.S.C. § 1395l(t)(21).  Congress's clear intent in creating that distinction was to create a grandfather provision for excepted PBDs, allowing entities that had been billing before November 2015 to continue billing under the OPPS, while non-excepted entities would be subject to a different payment system (later determined by CMS to be the Medicare Physician Fee Schedule).  *See id.*  § 1395l(t)(21)(C); H.R. Rep. No. 114-604, at 10 (2016).

47.     Congress necessarily understood and clearly intended that these separate payment systems would entail separate payment rates.  And Congress intentionally grandfathered qualifying off-campus PBDs that were already in existence at the time the different payment system for non-excepted PBDs was put in place in order to ensure that the excepted PBDs would still be paid under the OPPS.  *See* 42 U.S.C. § 1395(t)(21)(B) (cross-referencing 42 C.F.R. § 413.65(a)(2)).

48.     By decreeing that excepted and non-excepted entities will now be subject to the same payment rate, CMS has effectively abolished that statutory separateness, performing an end-run around the congressional mandate.  But the agency lacks authority to nullify the Medicare statute in such manner.

18

49.     The Clinic Visit Policy set forth in the Challenged Rule is *ultra vires* for this reason as well.

## Plaintiffs Will Suffer Concrete and Imminent Harm Absent Judicial Intervention

50.     The Plaintiffs rely heavily on the structure of Medicare payments established by Congress to provide critical outpatient services for the at-risk, elderly and infirm populations in their communities, many of whom have been historically underserved.

51.     As CMS itself notes, the challenged policy will result in a total reduction in payments for outpatient services of approximately $380 million in CY 2019.   83 Fed. Reg. 59,014.

52.     The Plaintiffs operate excepted PBDs that are statutorily entitled to be paid differently from non-excepted PBDs.  The Challenged Rule reduces the payment rate for covered services performed at the excepted PBDs.  If the Challenged Rule is left in place, Plaintiffs face the prospect of serious payment reductions for affected services, and may have to make difficult decisions about whether to reduce services in response to the lowered payment rate.

53.     This is particularly troubling for hospitals already operating at low or negative margins.

54.     Plaintiffs and the vulnerable patients and communities they serve face concrete and imminent harms—both economic and noneconomic—if CMS's Challenged Rule is allowed to stand.

## COUNT I
### (*Ultra Vires* Agency Action)

55.     Plaintiffs re-allege and incorporate by reference the allegations made in the foregoing numbered paragraphs of the Complaint.

30824651.1

56.     This Court has the inherent power to review alleged *ultra vires* agency action when an agency patently misconstrues a statute, disregards a specific and unambiguous statutory directive, or violates a specific command of a statute.  *See, e.g.*, *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1168 (D.C. Cir. 2003) (agency action is *ultra vires* when it "exceed[s] the agency's delegated authority under the statute."); *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (agency violation of "clear and mandatory" statutory provision is *ultra vires*).

57.     The Clinic Visit Policy is *ultra vires* because it is not budget neutral.  Annual adjustments to payment rates for ODPs must be budget neutral.  42 U.S.C. § 1395l(t)(9)(B).  But by CMS's own admission, the Clinic Visit Policy would result in a net reduction in total outpatient-services payments of more than $380 million for CY 2019.  83 Fed. Reg. 59,014.  Rather than providing for offsetting increases in payments for other services or adjusting the generally applicable conversion factor—as required by statutory safeguards enacted to curb the agency's discretion—CMS chose to slash the payment rate for a particular set of services and thereby reduce total expenditures.  That is clearly in excess of the agency's statutory authority.

58.     The Clinic Visit Policy also is *ultra vires* because it effectively eliminates the statutorily mandated distinction between excepted and non-excepted PBDs.  Congress intentionally created two classes of off-campus PBDs: excepted and non-excepted ones, with the clear expectation that they would be paid differently for outpatient services.  The Challenged Rule, premised on CMS's contrary policy preferences, effectively erases that distinction by providing that outpatient services provided at excepted and non-excepted PBMs be subject to the exact same payment rate.

59.     For these and other reasons, CMS has simply ignored Congress's instructions contained in the Medicare Act.  The agency's wholly unauthorized adoption of the Clinic Visit Policy is *ultra vires* and cannot stand.

## PRAYER FOR RELIEF

Plaintiffs respectfully pray for the following relief:

A.     A declaration pursuant to 28 U.S.C. § 2201 that the Challenged Rule exceeds CMS's statutory authority under the Medicare Act, 42 US.C. § 1395l, and is unenforceable to the extent it does so;

B.     Preliminary and permanent injunctive relief (i) vacating and barring Defendants from enforcing the *ultra vires* changes made to the Hospital Outpatient Prospective Payment System and Ambulatory Surgical Payment System for Calendar Year 2019; (ii) requiring CMS to conform its payment policies and conduct to the requirements of the Medicare Act; and (iii) ordering that Defendants provide immediate payment of any amounts improperly withheld as a result of the unauthorized conduct described above to Plaintiffs.

C.     An order awarding Plaintiffs their costs, interest, expenses, and attorneys' fees incurred in these proceedings pursuant to 28 U.S.C. § 2412; and

D.     Such other and further relief as the Court deems just and proper.

Respectfully Submitted,

Kenneth R. Marcus
DC Bar No. MI-0016
HONIGMAN LLP
660 Woodward Avenue, Suite 2290
Detroit, Michigan 48226-3506
Phone: (313) 465-7470
Fax: (313) 465-7471
kmarcus@honigman.com
Counsel for Plaintiffs

Dated: April 25, 2019